# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

STELLA ELLIS                                        **PLAINTIFF**

VS.                              **CIVIL ACTION NO. 3:15cv123**

**JUDGE JIMMY VANCE, CALHOUN COUNTY, MISSISSIPPI,
DEPUTY KENNETH WHITE, SHERIFF GREG POLLAN
and LYNN RODGERS**                          **DEFENDANTS**

## ORDER

This cause comes before the court on the motion of defendants, pursuant to Fed. R. Civ. P. 56, for summary judgment. Plaintiff Stella Ellis has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is well taken and should be granted.

This is, *inter alia*, a false arrest case in which plaintiff contends that she was unlawfully arrested, convicted and incarcerated for simple assault upon her neighbor, Darlene White. Plaintiff was convicted of assaulting Darlene on January 22, 2014 by Calhoun County Justice Court Judge Jimmy Vance, in a bench trial which was conducted the very next day after the two neighbors were arrested for fighting outside their homes at a Calhoun County trailer park. Judge Vance, who is a defendant in this action, sentenced plaintiff to six months in jail, with five of those months suspended, and a fine of $336.75. Vance subsequently sentenced plaintiff to two thirty-day sentences for contempt, the first for "screaming" in court that she would "never" pay the fine

1

and the second for referring to Vance, in plaintiff's recollection, as "a dirty old judge."[1] [Vance depo. at 29; Plaintiff's depo. at 51].

The arrest of the neighbors for assaulting each other represented the culmination of a lengthy feud between the two women, as well as Darlene's husband Charles White. The feud centered around whether a large oak tree represents the boundary line between the Ellis and White properties. The plaintiff, Stella Ellis, claims the tree as the property line. The Whites disagree. This old oak tree served as the focal point for the neighbors' arguments. Plaintiff contends that her neighbors threatened to burn it down. She testified in her deposition that she found the behavior of Charles White to be particularly objectionable, and she asserts that she called the sheriff's department on Charles dozens of times for "cussing and hollering and raising cane" as well as making threats and "starting fires."[2] [Plaintiff's depo. at 15]. Plaintiff complains that, frequently, the sheriff's department refused to respond to her 911 calls and even threatened to arrest her if she continued to make them.

On January 21, 2014, the dispute among the neighbors reached, for the first time, the point of a physical confrontation. This altercation began as the Whites had pulled up their vehicle and were unloading firewood in a location (under the disputed tree) which plaintiff found to be objectionable. In her deposition, plaintiff admitted that she was highly agitated by what she saw

---

[1]Vance recalls plaintiff referring to him as a "trashy" judge. [Vance Depo. at 31]. When asked in her deposition why she called Vance a "dirty old judge," plaintiff responded "[b]ecause he is." [Plaintiff's depo. at 36].

[2]The exact location of these alleged fires, in particular whether they were set on the Whites' own property, is not entirely clear to this court. Plaintiff testified that litigation which the parties pursued over the property line did not produce a clear result. Thus, it frequently appears to be a matter of disagreement among the neighbors on whose property a certain activity took place.

as a provocation by her neighbors, and she concedes that she confronted them about it.  In her deposition, plaintiff described the January 21 altercation as follows:

> Well, I went out the door and I was mad, and I told them they wasn't going to do it and to get their truck off of my land and away from my trailer.  And we got all this videotaped and everything.  And we got into an argument.  And so Darlene winds up - me and Darlene winds up in the road, in the city street here.  And Darlene just politely beats me up.  So I called the law.  And the law comes down there and he arrests me and Darlene.  And I told him, I said "I didn't do nothing."  And I didn't.  I didn't hit the girl.  I didn't do nothing.  I just stood there and took my beating and called the cops.  And we both wind up in jail.

[Plaintiff's depo. at 28-29].  After interviewing plaintiff and her neighbors, the responding deputies concluded that a mutual fight had occurred, and they arrested both women for simple assault.

Plaintiff's neighbors testified that plaintiff deliberately provoked the fight.  Specifically, Darlene testified that:

> A: We had been to the doctor, to dentist, and we come in with a load of firewood.  And Charles had backed the pickup down.  And before he even got the truck cut off, she was out there beating on the hood of the truck, cussing, threatening to kill us, threatening to blow our brains out.  And you know, we were just trying to ignore her. ***  And she kept trying to provoke Charles to fight.  She had even poked him in the chest with her finger, you know, a time or two. *** And I told him, you know, wasn't no need in all the fighting and stuff.  If we are going to fight, you know, to fight.  You know, just quit all this mess.  Or she had said something about fighting.  I don't remember who said something about it first.  And she went up on in the road.  You know, it was a public street where it happened.  She had went on up in the road.  And I followed her up in the road.
> Q: So did she - did she - who touched who first?
> A: I don't know.  She was already drawed up to hit me when I got there.  I don't know whether she hit me first or I hit her first.

[Darlene White depo. at 10-11].  In describing the manner in which plaintiff confronted his wife, Charles White testified that plaintiff:

[G]ot up there in the street hollering and screaming "You want to whoop my ass?[3] Just come on up here," and everything like that. "Your mama is this and your mama is that." And my wife just done absolutely had a damn belly full of it.

[Charles White depo. at 12].

Charles White's story about which woman struck the other first has changed greatly since plaintiff's arrest and conviction. At a probable cause hearing the morning after the fight, Charles initially testified before Calhoun County Justice Court Judge Mark Ferguson that plaintiff had struck his wife first.[4] [Charles White depo. at 15]. Judge Ferguson apparently found Charles' account believable and issued a warrant for plaintiff's arrest. Charles gave this same testimony at a bench trial that same day before Judge Vance, who, as noted previously, found plaintiff guilty of simple assault. The parties appear to agree that it was highly unusual to have a trial on the same day as plaintiff was arrested, but they disagree regarding who is responsible for this occurring. Judge Vance, supported by an affidavit from the prosecutor, testified that plaintiff insisted on having a trial that same day, even though she was informed that she did not have to do so. [Vance Depo. at 23; Tina Scott affidavit at 1]. Plaintiff denies this assertion and maintains that she was forced to go to trial that day, without having first been advised of her right to counsel. [Plaintiff's depo. at 40-41].

In his deposition, Judge Vance conceded that, at trial, plaintiff raised the existence of a

---

[3]Generally interpreted as an invitation to engage in some form of pugilistic competition not limited to fisticuffs but which may include, again without limitation, hair-pulling, nose twisting, eye gouging, stomping, etc.

[4]Plaintiff does not appear to hold Judge Ferguson in much higher regard than she does Judge Vance. In her deposition, plaintiff testified that "I don't know why I'm talking about Judge Ferguson today. I don't like him either. He is just a little kid. He doesn't even need to be on the bench." [Plaintiff's depo. at 41-42].

video of the altercation which, she contended, would exonerate her.   [Vance Depo. at 19].  This

video was made as part of a homemade surveillance system set up and maintained by plaintiff's

daughter Melanie Fuller.  Plaintiff testified that she did not know how to retrieve video from the

surveillance system, and she contends that jail administrators denied her permission to call her

daughter and tell her to retrieve it and bring it to court. [Plaintiff's depo. at 56].  Fuller testified in

her own deposition, however, that she had learned that her mother would be in court by talking to

local officials after plaintiff had called her immediately following the altercation. [Fuller depo. at

10-12].  Fuller testified that she retrieved the video on the day of the fight and tried to make it to

her mother's court hearing on time but was unable to do so due to personal issues. [Id.]  As a

result, the video evidence was not shown at trial and Judge Vance found her guilty without seeing

it.  In explaining his decision to find plaintiff guilty without viewing the video evidence, Judge

Vance testified that:

> Q:  Well - did she mention this video before you found her guilty or not?
> A: Yes, sir.  Yes, sir.  But we were already into the trial.  She said she was
> prepared to go with it, and she wanted to get it behind her.

[Vance depo. at 19].

Judge Vance conceded in his deposition that, soon after he rendered his guilty verdict,

Fuller came to his chambers and urged him to look at the video evidence but that he refused to do

so "because we were not at court." [Id.]  While Judge Vance thus declined to look at the video,

the court hearing plaintiff's appeal did so, and it overturned her conviction on the basis of that

evidence.  The exculpatory nature of the video can also be observed from the fact that Charles

White, contrary to his initial testimony, now concedes that plaintiff did not actually strike his wife

first.  Unfortunately for plaintiff, that exoneration did not come until after she had served her

sentence for assault.  Aggrieved at having served a sentence for an offense she (apparently) did not commit, plaintiff filed the instant § 1983 action against Judge Vance and various other governmental defendants involved in her arrest, conviction and incarceration.  These defendants have presently moved for summary judgment, contending that no genuine issue of fact exists regarding plaintiff's right to recover against them and that they are entitled to judgment as a matter of law.

### Deputy KennethWhite

Each of the five defendants in this case have filed motions for summary judgment, but this court will begin with that of Deputy Kenneth White, since he was the first of the defendants to encounter plaintiff.  In considering this defendant's motion, this court will begin with a point which should be obvious but which it believes worthy of emphasis.  In considering plaintiff's claim against Deputy White, this court should consider only that defendant's own actions, based on the facts he had available to him at the time.  In this case, there is good reason to believe that plaintiff may have suffered a wrongful conviction and incarceration, based on certain events which had nothing to do with Deputy White.  For example, considering the manner in which Charles White changed his story after learning of plaintiff's video evidence, it appears that he may have offered perjured, or at least seriously mistaken, testimony in this case.  Moreover, this court believes, as discussed below, that Judge Vance committed a serious error in judgment in refusing to view the video evidence which was brought to his attention both before and after he convicted plaintiff and sentenced her to jail.

As a private citizen, Charles White faces no liability under § 1983, and, as discussed below, Judge Vance enjoys absolute judicial immunity for any mistakes he made in convicting plaintiff. While these facts may mean that plaintiff lacks an effective remedy under federal law for the wrongful conviction she suffered, they should not lead this court to hold Deputy White responsible for something he did not do. Likewise, these facts should not lead this court to disregard the well-established legal standards applicable to officers such as Deputy White, in a misguided attempt to find someone to hold accountable for a wrongful conviction. The Fourth Amendment offers protection against "unreasonable" searches and seizures, and, in applying those protections to police officers, the U.S. Supreme Court has recognized that officers are frequently forced to make split-second decisions and judgment calls that courts should not be overly eager to second-guess from isolated judicial chambers. It is entirely appropriate that this court apply this approach as to Deputy White, notwithstanding any breakdowns which may have occurred in the judicial system after he arrested plaintiff. With these considerations in mind, this court will now proceed to the substance of Deputy White's motion.

Plaintiff has asserted unlawful arrest claims against Deputy White in his individual capacity, and, in response, he has raised the defense of qualified immunity. In considering this defense, this court applies the Fifth Circuit's qualified immunity standard, which it has described as follows:

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights. If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the

conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). Thus, the first prong of the qualified immunity test asks whether the defendant violated one of the plaintiff's constitutional rights, and the second asks if the right in question was "clearly established" at the time of the officer's actions.

Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity). While the qualified immunity standard is thus quite favorable to defendants, this court also recognizes that, at the summary judgment stage, it must consider the facts in the light most favorable to the plaintiff, as the non-moving party. Indeed, the U.S. Supreme Court has recently emphasized that district courts are required to "draw[] inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong" of the qualified immunity standard. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).

In light of the foregoing, this court will consider the facts of this case in the light most favorable to plaintiff, but it must emphasize that, to survive a qualified immunity defense, it is incumbent upon *her* to do the "heavy lifting" of presenting federal authority in support of her claim. Time and again in her briefing, plaintiff fails to do so. Indeed, the distinction between the first and second prongs of the qualified immunity standard is rather blurred in this case due to the fact that, in her briefing, plaintiff repeatedly fails to offer federal authority arising in factual

8

circumstances even remotely analogous to those here. For example, in her briefing relating to Sheriff Pollan, plaintiff offers *state law* authority which, she contends, establishes vicarious liability on the part of that defendant under Mississippi law. [Plaintiff's brief at 8]. Defendants correctly argue that such state law is simply irrelevant for the purposes of establishing liability under federal law, but, time and again, plaintiff seeks to offer such authority in lieu of federal authority on point. This is clearly improper.

In asserting claims against Deputy White, plaintiff does offer some federal authority, but, as discussed in this court's analysis of the second prong, it is exceedingly vague and sheds little light on the question of whether White may have violated the Fourth Amendment under facts even reasonably similar to those in this case. As discussed below, plaintiff's failure to offer more specific authority means that she is unable to establish the "clearly established" prong of the qualified immunity test, but it also makes it exceedingly difficult for her to establish that a Fourth Amendment violation occurred at all in this case.

Having said that, this court does agree that the basic probable cause standard provides a useful, and necessary, starting point for a discussion of Deputy White's actions in this case. For example, it is well settled that the question of whether her arrest in this case was legal "hinges on the absence of probable cause." *Soreson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 2008). It is similarly clear that "[p]robable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). Moreover, while Mississippi law does not determine whether the Fourth Amendment was violated in this case, the nature of the offense for which plaintiff was

arrested is, in fact, relevant in an unlawful arrest case.  In this vein, this court notes that plaintiff

was arrested for simple assault on her neighbor, and Mississippi statutory law provides that:

> (1)(a) A person is guilty of simple assault if he (i) attempts to cause or purposely,
> knowingly or recklessly causes bodily injury to another; (ii) negligently causes
> bodily injury to another with a deadly weapon or other means likely to produce
> death or serious bodily harm; or (iii) attempts by physical menace to put another in
> fear of imminent serious bodily harm; and, upon conviction, he shall be punished
> by a fine of not more than Five Hundred Dollars ($500.00) or by imprisonment in
> the county jail for not more than six (6) months, or both.

Miss. Code. Ann. § 97-3-7(1)(a).

While the basic probable cause standard and the relevant Mississippi criminal statute are

clear enough, they provide little guidance to this court in determining whether Deputy White may

have violated the Fourth Amendment based on the circumstances present in this case.  From

reviewing plaintiff's arguments, her theory that Deputy White violated the Fourth Amendment in

this case seems to hinge primarily upon her allegations that 1) he failed to view the exculpatory

video of the altercation in this case prior to arresting her and 2) the remaining evidence which was

available to Depute White, in particular witness statements from Darlene White and her husband,

was insufficient to lead a reasonable officer to believe that probable cause existed to arrest her.

In considering Deputy White's actions in arresting plaintiff, this court emphasizes once

again that it must give plaintiff all reasonable inferences regarding disputed facts in the record.  At

the same time, this court believes that, in this case, it may be legitimately questioned just how

much weight plaintiff's own self-serving testimony will bear.  In so concluding, the court notes

that plaintiff's own testimony appears to impeach her reliability as a witness.  For example, when

asked in her deposition about a 1995 malicious mischief charge against her, plaintiff testified that:

A: I'm sorry.  I was shaking my head.  I got marbles up there, you know.  No, I

don't remember this.

[Plaintiff's deposition at 27]. Morever, when asked about a court appearance involving her property line dispute with her neighbors, plaintiff testified that:

> A: And we did come to court and stuff over it. They never could prove that they owned it. I never did prove that I owned it. But we did come to court. And Judge Ferguson thought we were crazy, which we are, so it wasn't far from wrong, and anyway. The trailer is still sitting there.

[Plaintiff's deposition at 14].

Clearly, plaintiff's reference to having "marbles in her head," being "crazy" and not being able to remember prior criminal charges against her does not enhance her credibility as a witness. This court further notes that the record is replete with disputed issues of fact which come down to plaintiff's word against those of multiple other witnesses. To give merely one example, plaintiff denied in her deposition that she insisted on going to trial the day after she was arrested, even though the Justice Court judge and the prosecuting attorney both unequivocally stated, in sworn statements, that she did so. It is not clear to this court why a prosecutor who is not a defendant in this action would lie about this issue, and it thus has serious reservations about the accuracy of plaintiff's version of events.

While this court thus considers it important to note, for the record, its reservations about plaintiff's credibility, it will nevertheless err on the side of determining disputed facts in her favor. In this case, Deputy White and plaintiff provide very different accounts of information at his disposal when he decided to arrest plaintiff for simple assault. With regard to the video of the incident, defendant Deputy White testified that:

> Q: When you arrived on the scene and were speaking with Ms. Ellis, did you take the opportunity to view the video recording at that point in time?

A: At that time I did not know there was a video.

[Deputy White depo. at 8]. While Deputy White thus appeared to deny knowledge of the video, plaintiff testified that she informed him of it, and this court will assume that she is testifying accurately on this issue.

While this court will thus impute knowledge of the existence of a video to Deputy White, it considers it important to consider the nature of that evidence. This is not a case where plaintiff had, say, video on a smartphone which she was prepared to show the deputies and which could be readily viewed by them. If it were, then this court believes that plaintiff would have a stronger argument that Deputy White acted unreasonably in arresting her without first watching it. In reality, however, plaintiff testified in her deposition that she told the officers to watch the video she recorded of the incident, even though she acknowledged that she did not know how to retrieve the video herself:

> Q: Because it looks like you're pointing back to your trailer. What are you telling them at that point?
> A: To watch the video; that I can't watch the video because I don't know how it works, but if they will back it up and look at it, they'll know I didn't hit her. I tried to get them to back it up and look at it.

[Plaintiff's deposition at 56].

In the court's view, plaintiff's concession that she was unable to watch the video herself considerably weakens her argument that Deputy White violated the Fourth Amendment by arresting her without watching it himself. Plaintiff testified that the video was the product of a makeshift home surveillance system set up and maintained by her daughter Melanie Fuller, upon whom she relied to retrieve recordings. Plaintiff further testified that it was not until she had already been found guilty that Fuller brought the video to Judge Vance in an (unsuccessful)

12

attempt to have him watch it. Once again, Deputy White denied even knowing at the time that a video of the incident existed, but, accepting plaintiff's testimony as accurate, it seems quite unreasonable for her to have expected arresting officers to have greater knowledge of the workings of her own home video system than she did. In this vein, this court notes that there are many forms of evidence which are better collected by experienced crime scene technicians, or, barring that, private individuals with the expertise to properly collect it. It appears to this court that the (apparently complex) video surveillance system described in plaintiff's testimony falls in the latter category, since her daughter was the one who set it up and who had the expertise to retrieve video from it.

Even assuming that this court's understanding of the nature of plaintiff's video system is inaccurate, the fact remains that she testified that she *told* deputies things which might lead a reasonable officer in Deputy White's position to conclude that the evidence was complex and should be retrieved by experienced individuals. That aside, the fact remains that Fuller testified that she did, in fact, retrieve the exonerating video on the same day that plaintiff was arrested. Moreover, Fuller testified that she was informed that her mother would likely be in court the next day and that she "attempted to get there on time, but was late."[5] This court will quote from Fuller's deposition testimony on this issue at length:

> Q: Okay. So just take me through the day and what happened that day. ***
> A: It was a normal day for me, and then, all of a sudden, my mother calls me again and says, "I'm probably fixing to end up going to jail because I've called 911 because Darlene assaulted me," or "hit me and pulled my hair," I think, was her

---

[5]As noted below, plaintiff asserts claims against Jail Administrator Lynn Rodgers for failing to allow her a phone call which, she contends, would have allowed her to tell her daughter of her court appearance the next day. Fuller's testimony indicates, however, that she was already aware of this planned court appearance.

words. And we talked. And then the law come up so we hung up. And I got my three-year old daughter, my twenty-one year old son and myself, and we headed to my mother's from Vardaman.

Q: Okay. And what happened when you got here?

A: Nobody was around so we went in, backup up the security system, and watched the front camera, and we seen what the altercation was and that the officers had took both in their vehicles.

Q: Okay. So did you try to go up to the jail and see your mom?

A: I called.

Q: Okay. And what was that conversation like?

A: "We are booking her. You'll have to try back later."

Q: Okay. What time was that, do you think?

A: Hmmm. Around twelve or maybe a little bit after, but, -

Q: Okay. So did you try to call back later?

A: Yes, ma'am.

Q: And what response did you get?

A: They couldn't tell me anything, but they advised me to be at court the next morning and she might would have [sic] court the next morning.

Q: Okay. And did you go the next morning to court?

A: I attempted to get here on time, but I was late.

Q: So what happened that you didn't get here on time?

A: My daughter was a little bit sick. I had a flat tire and it was cold, and I had trouble getting all of that set up, but I was in Pittsboro by ten o'clock in the morning.

Q: Okay. And once you got to town, what did you do?

A: I went to my mother's and dropped off Melvin and my daughter. Then I come back to the courthouse. Well, it was in court so I had to wait. Okay. So I sat down, whatever office it is, and waited. And when he got through, he called me in there so I walked through the office and into the major courtroom. And we discussed the Stella Ellis assault. And I told him that she wasn't guilty, and I had the video that proved it and had my computer and everything on me. And he said "I've done ruled in the case, I'm not watching it."

Q: Okay. What did you do after that?

A: What could I do? I turned around and left.

[Fuller depo. at 10-12].

This court certainly does not seek to blame Fuller for being late for her mother's court appearance, but her testimony does illustrate that it would be quite unreasonable to hold Deputy White liable for not watching the video, under the circumstances of this case. Quite apart from

14

the apparent complexity of the video system, it seems clear that a large number of things had to happen for plaintiff to be convicted without the exonerating video first being viewed by Judge Vance. First, plaintiff had to go to trial the day after she was arrested. While the parties disagree regarding whether plaintiff or Judge Vance is to blame for this fact, they do agree that it was quite unusual to have a trial that quickly. Deputy White had no apparent basis for knowing this would occur at the time he arrested plaintiff. Second, Judge Vance had to decide to render a verdict of guilty even after plaintiff informed him of the exonerating video's existence. This court believes this may have been an error in judgment, but, even so, it was one which was attributable to Judge Vance alone, and not Deputy White. Third and finally, even if all of these things had not occurred, plaintiff would still presumably not have been convicted if Fuller had managed to get to court on time. Thus, under the facts of this case, it appears to this court that plaintiff is improperly seeking to hold Deputy White liable for the unfortunate circumstances surrounding the video.

In concluding that Deputy White acted reasonably in arresting plaintiff without first viewing the video, this court also notes that he had reason to believe that time was of the essence. In so concluding, this court notes there is extensive evidence in the record regarding the heated nature of the feud in this case, and Deputy White testified that he was aware of that feud. On the day plaintiff was arrested, the feud had actually erupted into physical violence which, while relatively minor, was certainly capable of escalating. Moreover, the arresting deputies knew that plaintiff and the Whites lived in extremely close proximity to each other and were in a position to harm each others' persons or properties, if they were inclined to do so. Under these circumstances, this court believes that Deputy White could have reasonably concluded that, even

if there was a possibility that the video referenced by plaintiff existed and might eventually prove her innocence, he had both probable cause and good reason to arrest her then and there.

This court does not intend to delve any further into the "what ifs" relating to the video, particularly since plaintiff offers no federal authority which "clearly established" that Deputy White was required to view it before arresting her. Such authority is essential for a plaintiff to hold Deputy White individually liable, since the qualified immunity standard prevents officers from being held individually liable unless they had "fair notice" that they were violating the U.S. Constitution or some other federal law. It thus seems clear that plaintiff will lose on the second prong of the qualified immunity standard, even if she could somehow establish a Fourth Amendment violation for purposes of the first prong. For the record, however, this court concludes that Deputy White did not violate the Fourth Amendment by arresting plaintiff without watching the video, and it will now turn to the question of whether the remaining evidence in this case might have led a reasonable officer to believe that probable cause existed to arrest her.

In considering the non-video evidence available to Deputy White, one piece of evidence strikes this court as being essentially clear: the fact that plaintiff's neighbors initially told police that, at a minimum, a mutual fight had been involved and, more than likely, that plaintiff was the aggressor.[6] Indeed, plaintiff specifically testified in her deposition, while describing her video taken after the police had arrived, that:

Q: And that is Mr. White that just walked up?
A: That's him. And he is telling about how I beat her up.
Q: So at this point, it's about the 26 mark in the video, and y'all are each telling

[6]In their brief, defendants cite certain other evidence, such as scratches which were allegedly visible on Darlene White's face, but this court regards much of this evidence as potentially involving disputed fact issues which should not be construed against plaintiff.

the officers two different stories, is that correct?
A: Yeah.

[Plaintiff's depo. at 57].  Thus, plaintiff herself testified that Charles White had told police that she had "beat up" his wife.  That strikes this court as being the kind of evidence which might lead a reasonable officer to conclude that probable cause existed to arrest plaintiff for simple assault.  Of course, it now appears that this story being told by Charles White was knowingly false, since he now admits, in light of the video evidence, that plaintiff did not hit his wife.  However, this fact is essentially irrelevant for the purposes of assessing Deputy White's state of knowledge at the time he decided to arrest plaintiff.

Deputy White was deposed regarding the arrest almost two-and-a half years after it occurred, and, like the other deponents in this case, he testified to limited recollection of it. Specifically, Deputy White testified that:

> Q: When you arrived on the scene on January 21st of 2014, what did Darlene White tell you, if anything?
> A: I believe I asked - I was questioning Ms. Ellis and the other officers were questioning Ms. White, I believe.  And sometimes we change and ask the other ones, too, so to see if their stories are matching or different.
> Q: What was the story you got that day?
> A: I don't know.  I can't remember the specifics.  But they were arguing.  One said that the other party had hit her and she hit them back, and then the other party said that, well, she hit me, so I hit her back.
> Q: So it was your understanding there had been a fight?
> A: Yes.

[Deputy White Depo. at 34-35].  Plaintiff denies ever having admitted striking Darlene, and this court will accept this assertion as accurate, for the purposes of this motion.  Nevertheless, the "gist" of Deputy White's understanding of the parties' stories, which may have been filtered partly through his fellow deputies, was that a mutual fight had occurred.

Given the parties' limited recollection of events, important confirmation of the basic nature of the "story" being told by Charles White at this time comes from the fact that Judge Ferguson determined the next morning that probable cause to arrest plaintiff existed, based largely (if not solely) upon Charles' testimony. In describing his testimony at Justice Court, Charles made it clear that he testified that plaintiff had struck first:

> Q: So what happened in court?
> A: I got up there and just said that Ms. Stella throwed the first lick, and that was all over with.

[Charles White depo. at 15]. In her own deposition, plaintiff provided similar testimony:

> A: The next morning at eight o'clock, I was over there in the courthouse in front of Judge Ferguson trying to defend myself. So I was going to explain to him why I was mad when I went out the door. He told me I was a babbling old fool and that he believed Charles White.

[Plaintiff's depo. at 29].

Thus, plaintiff testified that, after hearing her and Charles' testimony, Judge Ferguson stated that he believed her neighbor and accordingly found probable cause to issue a warrant for plaintiff's arrest. Later that same day, Judge Vance heard Charles' same story, apparently found it credible, and accordingly found plaintiff guilty of simple assault. In the court's view, the fact that two separate judges heard Charles White's testimony and found it sufficient for either a warrant or actual conviction makes it exceedingly difficult for plaintiff to argue that no reasonable officer could have believed that probable cause existed to arrest her based on Charles' eyewitness account.

In the court's view, a reasonable officer in Deputy White's position could have also used his knowledge of the basic nature of the feud between plaintiff and her neighbor as further support

for a conclusion that a mutual fight was involved. While the parties appear to dispute who was at fault in virtually every aspect and incident of the feud, this court believes that, even considering the facts in the light most favorable to plaintiff, the long-running feud can only be regarded as a mutual one in which neither side is blameless. Indeed, even with regard to the January 21, 2014, incident, plaintiff testified, in describing Charles White's testimony, that:

> At eight o'clock the next morning, she was sitting down there on the bench with Charles and Charles was Darlene's witness. He got up there and he said I came out of the door hollering and screaming and flopping my arms in the air. And he painted a pretty good picture of a wild woman, which I felt pretty wild, but I wasn't quite that bad.

[Deputy White depo. at 40].

Plaintiff thus conceded that she "felt pretty wild" at the time she confronted her neighbors, although she clearly believes that she had a right to be angry based upon what she regards as a pattern of provocations by the Whites. Regardless of whether this is true or not, this testimony provides further support for this court's overriding impression of the nature of the dispute between plaintiff and her neighbors: that it was a mutual feud in which each side shares part of the blame. Indeed, while the video evidence demonstrates that plaintiff did not physically strike Darlene, she admitted that she angrily confronted her neighbor for unloading firewood near the disputed tree. Plaintiff appears to concede that she has never legally established that the tree is on her property, however, and, that being the case, one version of events is that she confronted her neighbors for unloading firewood on their own property. Thus, while plaintiff may not have committed the crime of assault, one version of events is that she was the instigator of the confrontation in this case, and not a particularly sympathetic one at that. The Whites appear to believe that plaintiff, who knew the confrontation was being videotaped, deliberately provoked

19

the fight in order to have one or both of them arrested. Though the court is hesitant to assign such premeditated executive scheming to Ms. Ellis, it is far from clear to this court that such is not the case. This court will assume for the purposes of this motion that this was not plaintiff's intent, but it regards it as important to note that even the events of January 21, 2014 are hardly clear cut.

In light of the foregoing, this court concludes that a reasonable officer in Deputy White's position could have used both eyewitness accounts and his knowledge of the nature of the feud to determine that the physical altercation in this case was a mutual one. In her brief, plaintiff offers no authority suggesting that eyewitness testimony regarding a mutual fight would be insufficient to lead a reasonable officer to conclude that probable cause existed to arrest both participants in the fight for simple assault. This court is similarly unaware of any such authority, and it would be very surprised if such were held to be the law. This court thus concludes that plaintiff has failed to demonstrate fact issues regarding whether Deputy White committed a Fourth Amendment violation at all in this case, and his qualified immunity defense is due to be sustained on the basis of the first prong of the qualified immunity standard.

This court now turns to the second, or "clearly established," prong of the qualified immunity standard. The U.S. Supreme Court has made it clear that the "clearly established" prong requires the plaintiff to make a very substantial showing of federal appellate authority on point, and it has, time and again, upheld qualified immunity defenses based on plaintiffs' failure to produce such authority. In *Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014), for example, the Supreme Court recently upheld a qualified immunity defense on the basis of the "clearly established" prong, emphasizing that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown
> that the official violated a statutory or constitutional right that was " 'clearly
> established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 131 S.
> Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). And a defendant cannot be said to
> have violated a clearly established right unless the right's contours were sufficiently
> definite that any reasonable official in the defendant's shoes would have understood
> that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent
> must have placed the statutory or constitutional question" confronted by the
> official "beyond debate." *Ibid.*

*Plumhoff,* 134 S. Ct. at 2023. Thus, the U.S. Supreme Court has stressed that plaintiff's burden

of demonstrating that defendants violated "clearly established law" requires not a citation to

generalized principles of law, but, rather, specific authority which "placed the statutory or

constitutional question" confronted by the official "beyond debate." *Id.*

Making the plaintiff's burden of producing relevant authority even more difficult, the

Supreme Court recently reiterated in *City and County of San Francisco v. Sheehan*, 135 S. Ct.

1765, 1778 (2015) that, to establish that the law in this regard was "clearly established," the

plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of

persuasive authority in the Courts of Appeals." In another 2015 decision, the Supreme Court

similarly wrote that:

> No decision of this Court even discusses suicide screening or prevention protocols.
> And "to the extent that a 'robust consensus of cases of persuasive authority' " in
> the Courts of Appeals "could itself clearly establish the federal right respondent
> alleges," *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, 135
> S.Ct. 1765, 1779, —— L.Ed.2d —— (2015), the weight of that authority at the
> time of Barkes's death suggested that such a right did not exist.

*Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015). *See also Ashcroft v. al Kidd*, 563 U.S. 731,

742, 131 S. Ct. 2074, 2084 (2011). Applying this standard, the Supreme Court in *Taylor*

unanimously concluded that the plaintiff had failed to produce the requisite showing of authority

and that dismissal based upon qualified immunity was in order. *Id.*

Given the sparse and highly vague nature of the federal authority offered by plaintiff in this case, it may legitimately be wondered why this court has spent so much time discussing the first prong of the qualified immunity standard, instead of merely ruling on the basis of the second prong. This court has done so largely in order to properly frame the issues upon which plaintiff is required to provide authority in support of her claims. Having done so, this court concludes that plaintiff is required to provide proof 1) regarding clearly established authority which gave Deputy White "fair notice" that he was required to view the video evidence in this case before arresting plaintiff, and 2) that Deputy White was not entitled to rely upon eyewitness accounts regarding a mutual fight in concluding that probable cause existed to arrest plaintiff for simple assault. In stating that plaintiff must "clearly establish" the law on these particular issues, this court believes that, if it is not clear to *it* that Deputy White was required to do these things in this case, then a reasonable officer could have had similar doubts. That is why the requirement of "clearly established" authority exists in the first place: to ensure that officers had fair notice that their actions were unlawful and to prevent them from being held personally liable on the basis of "Monday morning quarterbacking" by courts. Plaintiff completely fails to meet this requirement in this case, as to all defendants who raise the qualified immunity defense.

While it may reasonably be questioned whether the above two issues, as phrased, are the precise ones which plaintiff is required to address with authority, it is abundantly clear that plaintiff has cast her net far too wide in this context. In her brief, plaintiff attempts to frame the analysis of the second prong in this case as follows:

To be clearly established, for purposes of evading a qualified immunity defense, a

right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. The Fifth Circuit has provided that the right to be free from arrest without probable cause is a clearly established constitutional right. *Brooks v. City of W. Point,* 639 Fed. Appx. 986, 989 (5th Cir. Miss. 2016). Additionally, as a general matter, it is beyond question that a person has a clearly established constitutional right to be free from arrest absent an arrest warrant or probable cause. *Freeman v Gore,* 483 F.3d 404 (5th Cir. 2007). To prove a violation of a constitutional right in the case sub judice, the standard, as set forth in *Jackson v. Jackson County,* 956 F. Supp. 1294 (S.D. Miss. 1995) provides "government agents are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the defendant."

It is frankly difficult for this court to imagine the second prong of the qualified immunity standard being phrased in a broader manner than this.

It should be apparent that, if all a plaintiff had to do to establish the second prong in a false arrest case is to cite the proposition that "the right to be free from arrest without probable cause is a clearly established constitutional right" then the second prong would be established in *all* false arrest cases. Likewise, the general principle that "government agents are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the defendant" is essentially meaningless as far as meeting the basic purpose of the second prong, namely to put an officer on fair notice that the *specific conduct* in which he is alleged to have engaged is unlawful.

The U.S. Supreme Court has repeatedly reversed appellate court decisions which sought to frame the second prong at too high a level of generality. In *Plumhoff*, for example, the Supreme Court wrote that "'[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 2023 (citation omitted). Similarly, in *Ashcroft v. al–Kidd*, the Supreme Court wrote that:

The Court of Appeals also found clearly established law lurking in the broad "history and purposes of the Fourth Amendment." 580 F.3d, at 971. We have repeatedly told courts—and the Ninth Circuit in particular, *see Brosseau v. Haugen*, 543 U.S. 194, 198–199, 125 S.Ct. 596 (2004) (per curiam)—not to define clearly established law at a high level of generality. *See also, e.g., Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999); *Anderson v. Creighton,* 483 U.S. 635, 639-40, 107 S. Ct. 3034, (1987); *cf. Sawyer v. Smith*, 497 U.S. 227, 236, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990).

131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011). The Supreme Court reaffirmed this principle

once again in its recent decision in *Mullenix v. Luna*, 136 S. Ct. 305, 311, 193 L. Ed. 2d 255

(2015), and the admonition against defining the "clearly established" prong based upon

generalized Fourth Amendment principles strikes this court as being one of the most-frequently

restated principles in the Court's qualified immunity jurisprudence. Of course, the Supreme Court

is not in a position to review *all* court of appeals decisions, and it is certainly possible to find

some which have taken this approach and yet not been reversed. This is particularly true with

regard to older appellate precedent decided prior to many of the Supreme Court decisions making

clear just how stringent the second prong is. Regardless, this court is clearly bound by the U.S.

Supreme Court's precedent in this content, and that Court's position on this issue could not be

any clearer.

One decision which this court believes that plaintiff has incorrectly relied upon is the Fifth

Circuit's recent decision in *Brooks v. City of W. Point,* 639 Fed. Appx. 986, 989 (5th Cir. 2016).

The Fifth Circuit in *Brooks* did cite its 1994 decision in *Mangieri v. Clifton*, 29 F.3d 1012, 1016

(5th Cir. 1994) for the proposition that "[t]he right to be free from arrest without probable cause

is a clearly established constitutional right," but, plainly, it did not rely *solely* upon such a

generalized principle in concluding that the officer had been provided fair notice that his conduct

was unlawful.  To the contrary, the Fifth Circuit wrote in *Brooks* that:

> It is regrettable when police are summoned and respond, only to be cursed.  But viewing the facts at the time of arrest in the light most favorable to Brooks, no reasonable officer could have believed that he could arrest Brooks solely because of the words he used during his first encounter with Birchfield, which constituted neither "fighting words" punishable under the First Amendment nor disorderly conduct under Mississippi law.  *See City of Houston v. Hill*, 482 U.S. 451, 461–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Gooding v. Wilson*, 405 U.S. 518, 521–28, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Jones v. State*, 798 So.2d 1241, 1247–48 (Miss. 2001) (en banc) (holding that a defendant's profane remarks to a police officer could not have given the officer reason to believe that a breach of the peace had occurred); *Brendle v. City of Houston*, 759 So.2d 1274, 1283–84 (Miss. Ct. App. 2000) (en banc) (holding that curse words addressed to a police officer were not fighting words punishable under Mississippi profanity statute).

*Brooks,* 639 Fed.  Appx. at 989.

    *Brooks* involved an officer who arrested a suspect who cursed at him, and, as the above quote demonstrates, the Fifth Circuit cited specific authority which, the court found, put an officer on notice that he was not entitled to arrest someone merely because he cursed at him.[7] In so doing, the Fifth Circuit relied partly upon the U.S. Supreme Court's decision in *City of Houston v. Hill*.  This is significant, since, as noted previously, the Supreme Court has suggested that either a single decision from that Court or a "robust consensus of cases of persuasive authority" from federal Courts of Appeals is required to "clearly establish" the relevant law.  *Taylor,* 135 S. Ct. at 2044.

    It is unclear to this court exactly how many federal appellate decisions a plaintiff might

---

[7]As quoted above, the Fifth Circuit relied partly upon Mississippi state law in so concluding.  It should be apparent, however, that the Court was not using that state law to establish the nature of a federal right, but merely to reject any *potential defense* by the officer that he was simply carrying out state law and should not be personally punished for doing so.  In this case, by contrast, the plaintiff seeks to use Mississippi state law for improper purposes, such as to establish a basis for vicarious supervisory liability on the part of Sheriff Pollan, which, as discussed below, the U.S. Supreme Court has plainly rejected in the § 1983 context.

need to establish a "robust consensus" of authority, but it is undoubtedly more than plaintiff has offered in this case. One of the few decisions which plaintiff does offer in this case is the Fifth Circuit's decision in *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir. 1988). Plaintiff cites *Bigford* for the proposition that "[t]hough law enforcement may rely on the totality of the circumstances available to them in determining probable cause, they also may not disregard facts tending to dissipate probable cause." [Plaintiff's brief at 10-11].

Based upon *Bigford,* plaintiff argues that it was "clearly established" that Deputy White was required to consider the video evidence which plaintiff claims she told him about before arresting her. This court notes that this would clearly be an insufficient amount of authority to establish a "robust consensus" of authority, even if it were on point. This court does not believe that it is on point, however. In *Bigford,* Texas police seized a vehicle under suspicion that it was stolen. In concluding that they acted without probable cause in doing so, the Fifth Circuit found "that further inquiry was indicated when the nationwide computer search produced no report that the vehicle matching either the VIN or the license plates on Bigford's truck had been reported stolen." *Bigford,* 834 F.2d at 1219. Thus, *Bigford* involved evidence of which the police were already aware and which they had reason to believe was exculpatory. In this case, by contrast, Deputy White had not seen the video and this court does not believe that he had reason to think he was required by the Fourth Amendment to retrieve and examine it prior to arresting plaintiff, for the reasons discussed previously. This court thus believes that *Bigford* is both distinguishable and clearly insufficient for plaintiff to meet the second prong as it relates to her video evidence.

As noted previously, the second issue on which, this court believes, plaintiff was required to "clearly establish" the law relates to her (apparent) contention that Deputy White was not

entitled to rely upon eyewitness accounts regarding a mutual fight in arresting her.  Plaintiff offers

no authority on this point, much less authority which "clearly establishes" it.  This is entirely

unsurprising to this court, since it seriously doubts that there is authority indicating that the

Fourth Amendment prohibits police from relying upon such eyewitness accounts, which constitute

one of the most basic, and common, forms of evidence.  If there were, then it seems likely that

police would find it difficult to maintain public order and enforce laws in a wide variety of

contexts.

Plaintiff suggests that Mississippi state law would have required Deputy White to obtain a

warrant before arresting her for a misdemeanor committed outside of his presence, but, even

assuming that this is true, state law does not determine the meaning of the Fourth Amendment to

the U.S. Constitution.  If plaintiff believes that Deputy White (or any other defendant in this case)

violated Mississippi law, then she should have filed state, not federal, claims against him.  The fact

that she did not do so is telling, and it would clearly be improper for her to seek to transpose that

state law on her federal claims.  Indeed, this court notes that the Mississippi Tort Claims Act

establishes quite stringent standards for recovering against law enforcement personnel, and it thus

seems highly likely that the state law plaintiff cites is, at best, taken out of context.  Plaintiff's

claims against Deputy White are based on the Fourth Amendment, and it is incumbent upon her to

produce authority "clearly establishing" that the actions she alleges that defendant took violated

federal law.  Plaintiff has clearly failed to do so, and Deputy White is accordingly entitled to

summary judgment on both the first and second prongs of the qualified immunity standard.


**Judge Jimmy Vance**

This court now turns to the motion for summary judgment filed by Calhoun County Justice Court Judge Jimmy Vance. As discussed below, this court concludes that this defendant is clearly entitled to summary judgment on the basis of absolute judicial immunity, but, at the same time, it does acknowledge that the allegations raised against him are concerning. In so stating, this court notes that there are two versions of what transpired at plaintiff's January 22, 2014 trial, one of them considerably more egregious than the other. The less egregious version, which this court believes to be more credible, is the one provided by both Judge Vance and Calhoun County prosecuting attorney Tina Scott. Ms. Scott has submitted a sworn affidavit in which she states that:

> 1. That Affiant's name is Tina Scott, and I have served as the Calhoun County prosecuting attorney in the Calhoun County Justice Court for the past six and one half years.
>
> 2. In my official capacity as the Justice Court of Calhoun County's prosecuting attorney, as part of my regular course of business, I was in the courtroom on January 21, 2014 when Stella Ellis was brought before Judge Jimmy Vance on a charge of simple assault.
>
> 3. Stella Ellis was adamant that she wanted to have her day in court that morning and despite Judge Vance advising her of her right to hire and [sic] attorney and to have a later trial date, she wanted to go forward.
>
> 4. Stella Ellis was found guilty of simple assault based upon the evidence presented in court that morning.

[Tina Scott affidavit at 1].

In his deposition, Judge Vance provided a description of plaintiff's actions that day which is consistent with Scott's. For her part, plaintiff provided a very different version of the relevant trial events during her deposition:

Q: So when you got to court that morning, were you ready to go forward? Did

you want to go forward with this testimony?

A: I didn't have no choice.

Q: And why do you say that?

A: Because we was in court, and I had to - I tried to tell the Judge what was going on. He said that I was a crazy old fool, babbling about nothing and trying to abuse the court because I wanted to tell him why I was mad.

Q: So but when you go in court that morning, did he, you know, did he offer to give you counsel?

A: No. Tina Scott talked to me and said I had to represent myself, that they were fixing to go up there and they were going to tell what happened, and then I could ask questions if I wanted to. And after he told me what he did, I said ain't no need in me asking you nothing. So I got up there on the stand, and, like I said, was trying to explain what happened. And so the Judge said, "I believe Charles White. You get six months, thirty days to spend, five months suspended."

Q: So did Ms. White testify that day?

A: I don't think she did.

Q: Okay. But the Judge, did he give you an opportunity to have the trial on a different date?

A: No.

[Plaintiff's deposition at 40-41].

In the court's view, plaintiff's version of events differs so dramatically from that offered by Ms. Scott and Judge Vance that it seems likely that one of the two versions is willfully false. Ms. Scott is, unlike plaintiff and Judge Vance, not a party to this lawsuit, and it finds her sworn declaration, which is corroborated by Vance's testimony, to be much more credible than plaintiff's testimony. Nevertheless, this court is required to make all reasonable factual inferences in plaintiff's favor, and it will assume for the purposes of its ruling today that plaintiff's self-serving version of events should be credited. Even so assuming, however, this still does not permit plaintiff to recover monetary damages against Judge Vance. This is because Judge Vance has raised the defense of absolute judicial immunity, and this defense is, as its name states, essentially absolute as to legal rulings by judges in cases before them.

In contending that absolute judicial immunity does not apply, plaintiff argues that:

In the present case, Judge Jimmy Vance loses absolute immunity pursuant to the second exception to judicial immunity because a judge is not immune for actions, though judicial in nature, are taken in complete absence of all jurisdiction. *Bradley v. Fisher,* 80 U.S. 335 (U.S. 1872). Relevant to the present case, Supreme Court jurisprudence on judicial immunity and the right to counsel has established certain prerequisites for jurisdiction. In the case of *Johnson v. Zerbst,* 304 U.S. 458 (U.S. 1937), the Supreme Court reversed and remanded the case on the basis of the deprivation of right to counsel. The Court went so far as to say, as it relates to being a jurisdictional prerequisite:

> If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty. A court's jurisdiction at the beginning of trial may be lost "in the course of the proceedings" due to failure to complete the court – as the Sixth Amendment requires – by providing counsel for an accused who is unable to obtain counsel, who has not intelligently waived his constitutional guaranty, and whose life or liberty is at stake. If the requirement of the Sixth Amendment is not complied with, the court no longer has jurisdiction to proceed. *Johnson v. Zerbst,* 304 U.S. 458, 468 (U.S. 1937).

In not complying with the Sixth Amendment, Judge Jimmy Vance lost jurisdiction to proceed. Stella Ellis maintains she was rushed to trial without appointment of counsel, having been told the morning of trial she had to represent herself.

[Plaintiff's brief at 7-8]. Plaintiff thus relies upon an exceedingly limited exception to the doctrine of absolute judicial immunity, namely for actions taken "in the complete absence of all jurisdiction." In arguing that Vance lacked such jurisdiction in this case, however, plaintiff relies upon *Johnson v. Zerbst,* which was a *habeas corpus* case in which the plaintiff was seeking to be freed from custody, *not* to obtain monetary damages against the trial court judge who erroneously denied the plaintiff counsel. By relying upon such clearly inapplicable authority, this court believes that plaintiff has essentially conceded Judge Vance's absolute immunity defense.

In his own briefing, Judge Vance cites *Stump v. Sparkman*, 435 U.S. 349 (U.S. 1978), in which the U.S. Supreme Court upheld a judge's absolute immunity defense in a case with far

more egregious facts than anything which is even alleged to have occurred here. *Stump* involved a claim against an Indiana state court judge who had signed an *ex parte* order authorizing the forced sterilization (on a mother's application) of a "mildly retarded" fifteen-year old girl. Under these facts, Justice Byron White, writing for the five-member majority, disagreed that there was a "clear absence of all jurisdiction" for the judge's order, noting that Indiana law gave circuit courts "original exclusive jurisdiction in all cases at law and in equity." *Stump*, 435 U.S. at 357. *Stump* illustrates the exceedingly broad nature of the absolute immunity defense which confronts plaintiff in this case, and, in this court's view, she has not even come close to surmounting it.

If plaintiff's version of events is to be credited, then Judge Vance committed error in conducting her trial. Indeed, this court notes that certain aspects of the proceedings in this case are concerning even under Judge Vance's version of events. As noted previously, Judge Vance testified that, at trial, plaintiff mentioned the existence of the video evidence before his verdict but that he elected to go forward with the trial anyway, citing her stated desire for a rapid resolution of the case. [Vance Depo. at 19]. Moreover, Judge Vance conceded that "[l]ater on, her daughter brought it for me to look at, and I refused to look at it because we were not at court." [Id.] Once again, Fuller similarly testified that:

> A: I went to my mother's and dropped off Melvin and my daughter. Then I come back to the courthouse. Well, it was in court so I had to wait. Okay. So I sat down, whatever office it is, and waited. And when he got through, he called me in there so I walked through the office and into the major courtroom. And we discussed the Stella Ellis assault. And I told him that she wasn't guilty, and I had the video that proved it and had my computer and everything on me. And he said "I've done ruled in the case, I'm not watching it."
> Q: Okay. What did you do after that?
> A: What could I do? I turned around and left.

[Melanie Fuller Depo. at 12].

31

Judicial immunity aside, this court believes that plaintiff has good reason to be upset with Judge Vance's willingness to convict her and sentence her to jail without first viewing the video which she correctly claimed would exonerate her. In so concluding, the court notes that Judge Vance testified in his deposition that it was very unusual to try plaintiff on the same day she was arrested, estimating that "two to three weeks" was a more typical amount of time between an arrest and a trial for simple assault in his courtroom. [Vance Depo. at 13]. In light of this fact, this court believes that it was incumbent upon Judge Vance to proceed extremely cautiously in conducting such a speedy trial, assuming he decided to go forward at all. This court believes that, once plaintiff informed Judge Vance of the video's existence, he committed error by choosing to find her guilty and send her to jail without first viewing it. In so concluding, the court notes that he had other options at his disposal, such as continuing the trial, to ensure complete fairness.

In the court's view, the overriding duty of any judge serving as trier of fact in a criminal case is to see that justice is done and, above all, to ensure that a defendant is not wrongfully imprisoned. This court concludes that, in this case, Judge Vance failed to take the proper steps to ensure that such an unjust result did not occur. In Judge Vance's defense, plaintiff may well have contributed to the overly hasty, and ultimately incorrect, guilty verdict in this case. In any event, she is unable to recover personally against Judge Vance even if she finds herself completely blameless. For purposes of this motion, this court will assume that plaintiff is, in fact, blameless in this regard. However, it is ultimately irrelevant whether she is or not. This is because Judge Vance's errors in this case were very clearly not made in the "clear absence of all jurisdiction." To the contrary, Judge Vance was plainly acting within the scope of his jurisdiction as the judge and trier of fact in state criminal proceedings against plaintiff, and all of the error he is alleged to

have made occurred in that capacity.

While some may legitimately question whether decisions such as *Stump* set the bar of absolute judicial immunity too high, this court is certainly not at liberty to disregard that authority. Judge Vance has cited additional judicial immunity authority in his briefing, *see, e.g. Adams v. McIlhany*, 764 F.2d 294 (5th Cir. 1985)*, Kemp v. Perkins*, 324 Fed. Appx. 409 (5th Cir. 2009), and this court agrees that it offers further support for his judicial immunity arguments. This court believes that this authority is essentially overkill, however, since, plaintiff has failed to offer serious opposition to Judge Vance's motion.

Indeed, it seems likely that, if plaintiff were held to have properly relied upon *Johnson v. Zerbst* as defeating judicial immunity, then erroneous rulings by trial judges on Sixth Amendment right to counsel issues would frequently lead to civil lawsuits against them. This might in turn lead some judges to improperly err on the side of making whatever ruling they felt would be least likely to result in their being sued. Absolute judicial immunity is based largely upon a policy determination that judges should be concerned with applying the law, and not with minimizing their own financial liability. The law entrusts judges with applying the law correctly, and when they fall short in this regard, the proper remedy is to have their rulings overturned on appeal. In more egregious cases, other remedies may be proper, such as seeking to have an appellate court remove a judge from a case or by filing a complaint with a judicial oversight body. It is certainly understandable that plaintiff would be distressed over having been imprisoned for an assault which she did not commit, but, whatever recourse she might have in this regard, a damages lawsuit against Judge Vance is not one of them. Judge Vance's motion for summary judgment will therefore be granted.

**Jail Administrator Lynn Rodgers**


This court now turns to plaintiff's claims against Calhoun County Jail Administrator Lynn Rodgers, as to which he has raised a qualified immunity defense. Once again, it is incumbent upon plaintiff to respond to such a qualified immunity motion by producing either a U.S. Supreme Court decision or a "robust consensus" of federal court of appeals authority which might have put Rodgers on notice that the conduct in which he is alleged to have engaged violated the U.S. Constitution. Moreover, this court reiterates that, in making this showing, plaintiff may not rely solely upon generalized principles of law, but she must, instead, produce the required quantum of federal appellate authority as set forth in cases which are sufficiently on point as to be properly regarded as fair notice to the defendant that his conduct was unlawful.

In this case, plaintiff has clearly failed to make the required showing of authority to overcome Rodgers' qualified immunity defense, as to any of her claims against him. Indeed, some of plaintiff's claims against Rodgers fail to even assert a coherent claim against him at all. For example, in alleging that Rodgers should be liable for the alleged failure to provide plaintiff with proper medical care while she was in jail, plaintiff argues that:

> Prison officials have certain duties under the Eighth Amendment, which include providing prisoners with "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care . . . ." *Gates v. Cook*, 37 F.3d 323, 332 (5th Cir. 2004). Stella Ellis, indeed, was wrongfully imprisoned for twenty-one days following her conviction. During her stay in the Calhoun County Detention Center, Stella Ellis was denied requested medical care. Pursuant to her testimony, "At one point I got - - took a cold and I figured it might have something to do with it. I told them I needed a doctor. They told me the onliest way anybody got out of there was in a body bag." Said denial of medical care to inmates potentially rises to the level of constituting a policy given that "they told quite a few of them that, though. They don't believe in doctors. You go out in a body bag."

[Plaintiff's brief at 12, record citations omitted].

In considering these arguments, this court first notes that plaintiff makes vague reference to statements which "they" allegedly made that she would only leave the jail "in a body bag." Plaintiff appears to seek to use this testimony to establish that Rodgers had the requisite mental state to support an Eighth Amendment claim against him.[8]  It should be apparent, however, that exceedingly vague testimony about something "they" said is not competent summary judgment evidence against Rodgers personally.  Indeed, as this court notes below in discussing the claims against Sheriff Pollan, the U.S. Supreme Court in *Ashcroft v. Iqbal* established a quite stringent scheme for supervisory liability which makes it very difficult to hold a supervisor liable under the U.S. Constitution for actions taken by his subordinates.  That being the case, vague testimony of the sort offered by plaintiff on this issue is clearly insufficient to establish personal liability on Rodgers' part.  If plaintiff seeks to hold Calhoun County liable on this issue, then hearsay statements such as "their" alleged comment about "body bags" would clearly be insufficient to establish a factual foundation for a finding of a county custom or policy denying prisoners medical care.

This court thus concludes that plaintiff's Eighth Amendment claim against Rodgers fails to even leave the starting gate, but, even if it had, she has not come close to demonstrating the sort of particularized showing of federal appellate precedent which might allow her to survive Rodgers' qualified immunity motion.  As quoted above, plaintiff cites the generalized principle,

---

[8]This court notes that the U.S. Supreme Court may be moving towards a more objective inquiry in Eighth Amendment cases, *see Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015), but Eighth Amendment claims against Rodgers have not been properly plead and proven in this case under any standard.

set forth in the Fifth Circuit's decision in *Gates*, that prison officials have a duty under the Eighth Amendment to provide prisoners with "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." While this seems non-controversial, plaintiff fails to offer any authority indicating that refusing to provide her with medical care for a minor medical condition such as a cold involves an Eighth Amendment violation. Moreover, plaintiff has certainly failed to offer either a U.S. Supreme Court decision or a "robust consensus" of federal appellate authority which "clearly established" this point. Once again, it is a clear requirement of the Supreme Court's qualified immunity jurisprudence, which it has iterated time and again in recent years, that plaintiff produce such authority in response to defendant's motion. As with all of her claims in this case, plaintiff has clearly failed to meet this requirement with regard to her Eighth Amendment claim against Rodgers.

Similarly lacking in authority is plaintiff's other primary claim against Rodgers, which involves a rather novel theory alleging that he violated the Sixth Amendment's Compulsory Process clause by failing to provide her with a phone call when she was booked into jail after her arrest. Plaintiff contends that she would have used this phone call to instruct her daughter Melanie Fuller to retrieve the video of the altercation between herself and Darlene White and bring it to court to use in her defense.

As this court did with plaintiff's Eighth Amendment claim against Rodgers, it will quote in full from the briefing on this issue.

> Additionally, Lynn Rodgers was complicit in the denial of Stella Ellis' rights to compulsory process. The right to compulsory process, secured by the Sixth Amendment grants to the accused personally the right to make his defense. While being booked by Jail Administrator Lynn Rodgers, Stella Ellis, did ask to make a phone call. Pursuant to his testimony, Jail Administrator Lynn Rodgers permits

36

someone to make a telephone call from booking if they ask to make a phone call. Stella Ellis was not permitted to make a phone call until after her hearing when Jail Administrator Lynn Rodgers responded to her saying, "You wanted to make a phone call, didn't you" and permitted her to make a phone call following her conviction.   Because Stella Ellis was not permitted to make a phone call, she was unable to have witnesses or video evidence present for trial.   It is the accused, not counsel, who . . . must be accorded compulsory process for obtaining witnesses in his favor.  *Rock v. Arkansas,* 483 U.S. 44, 47 (1987).  The Supreme Court goes even further in saying:

> Even more fundamental to a personal defense than the right to self-representation, which was found to be necessarily implied by the structure of the U.S. Const. amend. VI, is an accused's right to present his own version of events in his own words.  *Rock v. Arkansas,* 483 U.S. 44, 47 (U.S. 1987)

In failing to afford Stella Ellis her requested phone call until after her conviction, Lynn Rodgers assisted in the violation of Stella Ellis' Sixth Amendment right to compulsory process by refusing to allow her to request evidence be brought to court which would have allowed her to present the story in her own words by having her video recording of the incident played at trial.  It being standard to provide individuals a phone call upon request, Lynn Roger's behavior was clearly unreasonable.  Lynn Rodgers is not entitled to qualified immunity and the *Motion for Summary Judgement* should be denied.

[Plaintiff's brief at 13-14].

At the risk of being a "broken record" on this issue, this court notes that, once again, plaintiff has improperly responded to a qualified immunity motion by citing a generalized principle of law (in this case the generalized compulsory process requirement) which by no means served to put a defendant in Rodgers' position on notice that the specific conduct in which he is alleged to have engaged violated the U.S. Constitution.  Plaintiff has also repeated another of the recurring mistakes in her briefing, namely by seeking to rely upon a state or local policy (in this case the jail policy allowing a phone call during booking) in support of a federal claim.  *See, e.g. Davis v. Scherer*, 468 U.S. 183, 191 (1983)(Appellants did not forfeit their qualified immunity from suit for violation of federal constitutional rights merely because they failed to comply with a clear state

regulation.).

As far as can be discerned from plaintiff's briefing, her compulsory process claim against Rodgers presents a novel theory of liability, but the qualified immunity context is, emphatically, not the context in which to raise a novel claim. To the contrary, the U.S. Supreme Court's qualified immunity jurisprudence reflects a conclusion that governmental officers should not be held individually liable for actions taken in the course of doing their jobs, unless they had fair notice that such conduct was clearly established as unlawful. Thus, in response to Rodgers' qualified immunity motion, plaintiff was required to produce either a U.S. Supreme Court decision or a "robust consensus" of federal appellate authority which put Rodgers on notice that, by failing to let her make a phone call to her daughter, he was denying her the right to compulsory process. She has clearly failed to do so.

While it is unnecessary to address this issue any further, this court notes, for the record, that it regards plaintiff's compulsory process theory against Rodgers to be quite suspect on its factual merits, quite apart from its being unsupported by authority. In so stating, the court reiterates that Fuller testified that she learned of her mother's planned court appearance on her own and that personal issues prevented her from bringing the video to court on time. Moreover, as discussed previously, Judge Vance testified that it was quite unusual for a defendant to face a criminal trial on the same day in which an arrest warrant was issued. While the parties disagree regarding whether plaintiff or Judge Vance is responsible for this occurring here, no one has suggested that Rodgers, as jail administrator, had anything to do with it or that he had reason to know that it would occur. Thus, the entire factual basis for plaintiff's compulsory process claim strikes this court as being faulty. This court thus concludes that plaintiff's claims against Rodgers

38

are both legally and factually without merit, and his motion for summary judgment will be granted.

**Sheriff Pollan and Calhoun County**

The court now turns to plaintiff's claims asserted against Sheriff Pollan, both individually and in his official capacity. The latter claims are, of course, properly regarded as claims against Calhoun County itself. As this court noted previously, plaintiff improperly seeks to rely upon the provisions of Mississippi state law to assert federal claims against Pollan, and this is clearly improper. Specifically, plaintiff writes in her brief that:

> Pursuant to Miss. Code Ann. §19-25-19, the Motion for Summary Judgment should be denied as it applies personally to Sheriff Pollen. Miss. Code Ann. §19-25-19 provides that all sheriffs shall be personally liable for the acts of their deputies. Miss. Code Ann. §19-25-19.

[Plaintiff's brief at 8]. Plaintiff thus argues that Mississippi statutes render Sheriff Pollan vicariously liable for the unconstitutional acts of his deputies, but there are two fatal defects with this argument. First, this court concludes that there were no constitutional violations by any of Sheriff Pollan's deputies in this case, for the reasons stated previously in its discussion of her claims against Deputy White.

Second, even if plaintiff could somehow be said to have established such a constitutional violation, the fact remains that he could not be held vicariously liable for it under federal law. Indeed, the U.S. Supreme Court established quite stringent standards for supervisory liability in its 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), specifically rejecting the notion that

government officials could be held liable for the unconstitutional conduct of their subordinates

under a theory of respondeat superior. In so ruling, the Supreme Court wrote that:

> [R]espondent believes a supervisor's mere knowledge of his subordinate's
> discriminatory purpose amounts to the supervisor's violating the Constitution. We
> reject this argument. Respondent's conception of "supervisory liability" is
> inconsistent with his accurate stipulation that petitioners may not be held
> accountable for the misdeeds of their agents.

*Ashcroft*, 556 U.S. at 677. Thus, plaintiff not only seeks to improperly rely upon state law in

establishing a violation of the U.S. Constitution, but the state law she does cite is flatly contrary

to, and superseded by, federal law. Plaintiff offers no valid argument that Pollan himself violated

the U.S. Constitution in this case, and her attempts to hold him personally liable are thus clearly

without merit.

Likewise without merit are plaintiff's claims against Sheriff Pollan, either individually or

officially, based upon his or his deputies' alleged failure to respond, on a number of occasions, to

911 calls made by plaintiff complaining about her neighbors. Specifically, plaintiff argues in her

brief that:

> The *Motion for Summary Judgment* should also be denied as it applies to Sheriff
> Pollen in his official capacity. The Fifth Circuit has held sheriffs to be the final
> policymakers with respect to all law enforcement decisions made within their
> counties. Official policy may be evidenced by custom. Respectfully, the behavior
> of Sheriff Pollen's subordinates indicates a custom of refusing to answer and / or
> respond to phone call from Stella Ellis. Pursuant to the testimony of Stella Ellis,
> she called the Sheriff's Department anywhere from forty to fifty times to which
> they only responded half of the time. Said refusal to respond to calls from a citizen
> reporting threats and violence towards her stands as a custom of the dereliction of
> duty which rises to the level of constituting a policy which resulted in a violation of
> her Fourth Amendment right due to the Calhoun County Sheriff's Department
> telling her to quit calling or they would have her arrested.

[Plaintiff's brief at 9].

Thus, as she does so often in her briefing in this case, plaintiff asserts an alleged violation of the U.S. Constitution without citing any actual federal precedent suggesting that such a violation might be established under facts comparable to those here. In this case, it is entirely unsurprising that plaintiff has failed to produce such authority, since the U.S. Supreme Court has held that, as a general matter, the government has no duty under the U.S. Constitution to protect individuals from privately inflicted harms. *See DeShaney v. Winnebago County Dept. Of Social Services*, 489 U.S. 189, 195 (1989). Professor Chemerinsky has noted that "*DeShaney* reflects a deeply entrenched belief that the Constitution is a charter of negative liberties - rights that restrain the government - and not a creator of affirmative rights to government services." Erwin Chemerinsky, Federal Jurisdiction, § 8.9 at 609 (6th Ed. 2012). Given the frontier era in which the U.S. Constitution was enacted, it seems entirely unsurprising that our founding fathers would not have intended to guarantee individuals governmental protection against hostile neighbors. While there are some exceptions to the general rule announced in *DeShaney*, such as for individuals held in governmental custody, plaintiff provides no indication that any such exception might be applicable here. Indeed, plaintiff offers no federal authority whatsoever on this issue.

While it is thus unnecessary for this court to address the substance of plaintiff's claims on this issue, it notes that, factually speaking, they are less than compelling. As quoted above, plaintiff argues that the sheriff's department failed to respond to a number of her calls complaining about the Whites, but, in her deposition, she seemed to describe many of these incidents by her neighbors as involving little more than insulting and unruly behavior. For example, in describing Charles White's behavior towards her, plaintiff testified that:

And he gets out there in the road cussing and hollering and raising cane. We got

tapes of it. It got so bad I was calling the law at least once a month, sometimes
more than that, and he was threatening to beat me up. And they was setting fires
all over the place. You see how wooded that place is.

[Plaintiff's deposition at 15].

In the court's view, plaintiff has failed to establish that activities such as "cussing and
hollering and raising cane" constitute criminal misconduct which the Calhoun County Sheriff's
Department should have allocated limited resources in addressing. Plaintiff appears to regard
Charles White's act of "starting fires" as involving criminal misconduct, but she generally offers
no evidence that such fires were started on her property or were otherwise a violation of the law.
In the court's view, it was incumbent upon plaintiff to create a much stronger factual foundation
for her allegations in this regard, particularly since she admits that she never legally established the
large oak tree in this case as being her actual property line. This court also reiterates that plaintiff
appeared to concede in her deposition that both she and Darlene White were accurately regarded
by Judge Ferguson as being "crazy," and the record in this case appears to reflect a widespread
belief among Calhoun County officials that plaintiff is a less than credible individual. Under these
circumstances, this court has considerable sympathy for the sheriff department's (apparent)
conclusion that it should not place a high priority on responding to plaintiff's complaints about her
neighbors.

True enough, some of the threats plaintiff alleges against her are of a more serious nature,
such as an alleged threat to burn the large oak tree down. Nevertheless, both sides allege such
serious threats in this case, and it frankly does not appear to this court that there is a law
enforcement solution to this problem. The intractable nature of the feud in this case seems to be
confirmed by the fact that it has continued unabated in the months and years since the January

2014 fight.  More recent episodes in the ongoing saga include the Whites having plaintiff arrested

for killing one of their dogs (which she denies), and Charles White having (admittedly) threatened

to "cut [plaintiff's] trailer in half with a chainsaw where our property line runs down the middle of

it." [Charles White depo. at 25].  Charles took care to emphasize, however, that his bark is worse

than his bite, insisting that "I have never went over and touched her trailer, never." [Charles White

depo. at 25].

      In light of *DeShaney*, the Calhoun County Sheriff's Department has no constitutional duty

to protect plaintiff from the Whites (or them from her).  Even if the law were otherwise, however,

it is not clear what the county could do to stop a feud which seems to be based largely on insults,

posturing, and, above all, a passionate belief on the part of both sides that the other is trespassing

on their property.  As Charles testified in his deposition:

> She's trespassing.  Get your ass and get over yonder and get your trailer drug over
> there on your own property or I'll push it over there.  Just when the judge gives
> me the say-so, all hell will break loose. *** I ain't stole nothing.  I married my
> wife.  She told me where the property line was.  I'm the one that got out and hired
> a surveyor to come in and find out where this property line was to make sure I was
> not trespassing.  Come to find out, I ain't trespassed nowhere.

[Charles White depo. at 26].  In her brief, plaintiff submits that "the boundary line dispute stands

as a red herring" in this case, but having read hundreds of pages of the record, this court does not

agree.[9]  As best this court can discern, both sides to this feud have an entirely sincere belief that

---

[9]Given the obvious importance to the parties of the property dispute in this case, plaintiff's
attempt to minimize it strikes this court as curious.  Charles White claims to have had a surveyor
confirm his property claims, and, if plaintiff is, in fact, living on his property, then she should not
expect the law to protect her non-existent right to trespass.  Property rights are capable of being
definitively established, and it strikes this court that some members of the Calhoun County bar
may be able to perform a public service and help settle, once and for all, exactly which side is
correct in this property dispute.

the other is living on their property.  Given the personalities involved, this court does not believe that the Calhoun County Sheriff's Department is in a position to stop the feud, so long as both sides continue to believe that the other is trespassing.  This court thus finds plaintiff's claims against Sheriff Pollan in his official capacity (i.e., the county) to be both legally baseless and factually weak.  Plaintiff offers no other valid theory of liability against Sheriff Pollan, and his (and the county's) motion for summary judgment is due to be granted.

It is therefore ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

So ordered, this, the 3rd day of January, 2017

 /s/ **Michael P. Mills**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**